**UNITED STATES of America ex rel.
John L. WILLIAMS, Petitioner,**

v.

**Michael LANE, et al., Respondents.**

**No. 85 C 9793.**

United States District Court,
N.D. Illinois, E.D.

Sept. 24, 1986.

Alison Edwards, Asst. Public Defender, Chicago, Ill., for petitioner.

Marcia L. Friedl, Asst. Atty. Gen., Chicago, Ill., for respondents.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

John Williams ("Williams") has filed a 28 U.S.C. § 2254 ("Section 2254") petition for a writ of habeas corpus against Michael Lane ("Lane") and Neil Hartigan ("Hartigan"). Now both sides have moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment. For the reasons stated in this memorandum opinion and order, this Court determines no evidentiary hearing is necessary and dismisses Williams' petition on the merits.

### Background

During the early morning hours of January 21, 1981 a Hanover Park apartment building went up in flames. Fire investigator Ronald Russell ("Russell") concluded someone had deliberately set the fire (R. 990). He believed one to five gallons of a liquid accelerant had been poured in a ground floor storage area, in the building's entranceways and on the stairways (R. 990, 1019). Russell determined the fire had started in the ground floor storage area (R. 993)—he had found the charred remnants of a cardboard box with rags inside about 2 to 4 feet from the storage room (R. 979–82).

Three people died in the fire. After a lengthy trial, a jury convicted Williams of one count of aggravated arson and three counts of felony murder. He was sentenced to a term of natural life imprisonment. Williams appealed both his conviction and his sentence, but the Illinois Appellate Court affirmed, 131 Ill.App.3d 597, 86 Ill.Dec. 703, 475 N.E.2d 1082 (1st Dist. 1985). Williams' petition for leave to appeal to the Illinois Supreme Court was denied June 4, 1985. This Section 2254 petition followed.

### Evidence at Trial

Because the Illinois Appellate Court's opinion affords a thorough statement of the evidence, a summary will suffice here. Other critical facts will be dealt with at appropriate places in this opinion.

At 11:30 p.m. January 20, 1981 Williams, John DeJonge ("DeJonge") and Wayne Mills ("Mills") sat talking in Mills' car in the driveway of Mills' Streamwood home (R. 655–57). Williams said he wanted to go light a fire (R. 657). Mills drove to a 7-Eleven store and then to a gas station (R. 660). According to Mills, Williams pumped gas into the car and then paid for it (R. 757). Mills testified he heard Williams make two statements about setting a fire:

1. As they left the gas station, Williams said "let's go smoke out some Spics" (R. 758).

2. After they started driving around, Williams said "come on, let's go burn a building, torch a fire, or something like that"—Mills did not remember Williams' exact words (R. 760).

Mills drove to a Hanover Park apartment complex where Williams used to live (R. 662–63, 761–62), parking the car 10 to 15 feet from the door (R. 669, 765). Williams jumped out of the car and went inside the building (*id.*). Both DeJonge and Mills testified:

1. Williams did not carry any container into the building (R. 725, 790).

2. He stayed inside less than a minute (R. 670, 765).

Williams returned to the car and said "let's go," and the three friends left (R. 766). They noticed smoke rolling across the road. When Mills asked Williams what he had done (R. 768):

Q. What response did you receive from John Williams?

A. He just said he lit a rag and threw it in a box.

David Saunders ("Saunders") testified Williams, DeJonge and Mills came to Saunders' home at 10 a.m. January 21, 1981 (R. 869). Williams told Saunders he wanted to show him something (R. 870). Mills drove the group to the burned building, and Williams pointed to it and said, "I did that" (R. 871). Saunders told Williams to "cut it out" but Williams insisted he did it (*id.*). Someone made a joke about Williams being a "baby killer" (R. 873). Williams himself mockingly repeated the "baby killer" comment that evening (R. 879). Later Williams gave Saunders a newspaper article about the fire and told Saunders he had started the fire by lighting a rag and throwing it into a storage room (R. 880–82).

Some few days later Saunders, after discussing the matter with his family, spoke to the police about what Williams had told him regarding the fire (R. 884). On January 30, 1981 Williams was arrested.[1] Next day the police questioned him about the fire (R. 1042). Williams admitted having driven through the apartment complex parking lot before the fire, but he denied starting the fire (R. 1052–53). Williams said he and his friends saw smoke afterwards and went back to the apartment building to watch it burn (R. 1054–55).[2]

DeJonge's mother Diane testified Williams lived in their home for several months (R. 1124). On at least two occasions Williams laughingly told her he was going to commit crimes (once he said he would go out to rob a bank, and another time he said he would go shoplifting), but she never knew him actually to have done so (R. 1126–31).

Williams' theory at trial was that he took credit for setting the fire only as a sick joke and that a Michael Cuniff ("Cuniff") had actually set the fire. To support that theory Williams offered the testimony of Daniel Mackowiak ("Mackowiak") and James Gustafson ("Gustafson"), who said they were at a party the night of the fire (R. 1338, 1377). They left to get gasoline and beer, and Cuniff rode with them in the back of Gustafson's pickup truck (R. 1340–41, 1377). Cuniff was "acting like—like he was drunk, and he was snorting glue, and he was on drugs definitely" (R. 1377–78). Gustafson dropped Cuniff off near the Hanover Park apartment complex before Gustafson went to the gas station (R. 1341–42, 1379).

---

**1.** Later, when Williams was in jail, he called Saunders, telling him to lie "if they asked any questions that were going to put [Williams] away for life" and adding "he [Williams] hopes that I [Saunders] don't cross him because he didn't want to cross me" (R. 913).

**2.** Though Williams did not take the stand himself, the testimony of others could scarcely have endeared him to the jury. Among other things, he said he did not particularly hate Hispanics, but "they are all the same" and "they could all go back where they came from" (R. 1054). And when Mills asked Williams if it bothered him that three people had died in the fire, his response was to shrug his shoulders and express regret that he "didn't get to screw the girl" (R. 775–76) (one of the three fire victims was a 16–year–old Laotian girl—though Williams indiscriminately characterized all the building's tenants as "Spics").

After buying gas and beer, Mackowiak and Gustafson drove back to the party. They saw Cuniff walking on the side of the road about one block from the apartment complex and picked him up (R. 1343–44, 1379). As they drove past the complex, Cuniff banged on the roof of the truck and screamed "fire" (R. 1344–45, 1380). Mackowiak and Gustafson dropped Cuniff off at Harold's Pool Hall and returned to the party (R. 1345–46, 1381). They saw the fire on their way back to the party (they had not seen it earlier, when Cuniff shouted) (R. 1347, 1381).

### Williams' Theories

Williams lists five grounds for habeas relief:

1. Exclusion of a statement contained in two police reports that Cuniff had told Gustafson he had set the fire deprived Williams of a fair trial in violation of the Fourteenth Amendment.

2. Exclusion of evidence tending to show the police had taped statements by DeJonge and Saunders violated Williams' due process rights.

3. Prosecutorial misconduct deprived Williams of a fair trial in violation of the Fourteenth Amendment.

4. Williams' arguments challenging the applicability of Illinois' mandatory life sentence provision were improperly ignored by the Illinois Appellate Court.

5. Application of Illinois' mandatory life sentence provision to Williams violated the Double Jeopardy Clause.

They are not, either singly or collectively, sufficient to withstand dismissal.

### Exclusion of an Alleged Third-Party Confession

Cuniff's claimed statement that he had set the fire appears in two separate police reports:

1. One such report reflects a statement by an unidentified caller that he had just picked up Cuniff hitchhiking and Cuniff had told him he had just attempted to set a fire at the Hanover Park apartment complex (R. 1792).

2. Another report said that a high school student had informed the police that Gustafson's sister had told the student that Gustafson had told her he had picked up a hitchhiker who said he had set the fire (R. 1794–95).

Neither report went to the jury, for the trial court granted the State's pretrial exclusion motion (R. 1894–95). On appeal that ruling was upheld on two grounds (131 Ill.App.3d at 605–06, 86 Ill.Dec. at 709–10, 475 N.E.2d at 1088–89):

1. There was no evidentiary showing that Cuniff ever actually made the inculpatory statement.

2. Even were Cuniff's alleged statement assumed to have been made, it lacked sufficient indicia of reliability to have been admitted.

In turn Williams now advances two arguments challenging the exclusion of Cuniff's asserted statement:

1. In an odd kind of contention, the Appellate Court's determination as to the lack of evidence supporting the existence of any statement is itself said to be "contrary to the manifest weight of the evidence" (Williams Mem. 5).

2. Sufficient indicia of the statement's reliability existed to require its admission under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

As to the first of Williams' arguments, what he really confronts is a determination of *fact* by the Illinois Appellate Court. On the State's pretrial motion, defense counsel had announced an intention to "introduc[e] at trial a statement from one Michael Kaniff [sic] made to one James Gustafson that he in fact had started the fire" (R. 94). After the trial court granted the State's motion in limine to exclude any such statement (R. 114–16), defense counsel asked to make an offer of proof as to Gustafson's anticipated testimony (R. 117). When the State's Attorney then suggested that would be more appropriately done at trial (*id.*), Williams' lawyer agreed and deferred

the matter (R. 118). At trial, however, no offer was made at all.

 Faced with that set of facts, the Appellate Court said this (131 Ill.App.3d at 605, 86 Ill.Dec. at 709, 475 N.E.2d at 1088):

The only indication of any incriminating statement made by Cuniff was the declaration made by defense counsel and two unsubstantiated police reports, neither of which even quoted the person to whom the admission was allegedly made. Furthermore, defense counsel's assertion that Cuniff confessed to Gustafson is refuted by the fact that Gustafson's report to the police, made immediately after his contact with Cuniff, made absolutely no mention of any statement by Cuniff. Finally, defense counsel failed to make his promised offer of proof when Gustafson testified. Therefore, there was not any threshold showing that a "confession" ever existed.

That last factual finding—a determination that the evidence at trial did not show the existence of Cuniff's claimed statement—is really "a determination after a hearing on the merits of a factual issue" (Section 2254(d)), which is presumptively binding on this Court even when made by a state appellate court. *Sumner v. Mata*, 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981). Williams' "contrary to the manifest weight of the evidence" argument cannot prevail, for the evidence to support *his* position was simply not there.[3]

That alone is enough to defeat Williams' first assertion of a constitutionally deficient conviction. But because the Illinois Appellate Court went on to deal with the inadmissibility of the claimed Cuniff statement even if it were assumed to have been

made to Gustafson, this Court will do the same.[4] Even on that arguendo assumption, Williams cannot sufficiently show the trustworthiness of that inculpatory statement to bring himself within *Chambers*.

*People v. Bowel*, 111 Ill.2d 58, 66–67, 94 Ill.Dec. 748, 752–753, 488 N.E.2d 995, 999–1000 (1986) (citations omitted) accurately summarizes the principles governing admission of a third person's confession:

Generally an extrajudicial declaration not under oath, by the declarant, that he, and not the defendant on trial, committed the crime is inadmissible as hearsay though the declaration is against the declarant's penal interest.... Such declarations may, however, be admitted where justice requires.... The Supreme Court of the United States, and this court as well, have held that where there are sufficient indicia of trustworthiness of such extrajudicial statements, a declaration may be admissible under the statement-against-penal-interest exception to the hearsay rule.... In *Chambers*, [410 U.S. at 300–01, 93 S.Ct. at 1048–49] the court, in holding a declaration admissible, stated that there were sufficient indicia of trustworthiness in that (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant....

There has been some uncertainty as to whether all of the objective indicia of trustworthiness appearing in *Chambers* must be present before a statement against penal interest will be admitted in

---

3. Williams should more accurately have labeled his argument as an attack on the evidentiary ruling announced by the Appellate Court. Framed that way, though, he would fare no better. Barring their possible vulnerability for violation of some specific constitutional guaranty (such as the Search and Seizure Clause or the Confrontation Clause), evidentiary rulings rarely implicate due process considerations. This one surely does not.

4. Indeed, given the course post-conviction proceedings so frequently take, a decision in this case resting solely on the ground just discussed would likely stimulate a new Section 2254 petition charging inadequate representation by trial counsel in having failed to make the promised offer of proof. Though *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) has made such claims more difficult to sustain, it is worth heading off that possibility by more extended treatment here.

evidence. The defendant contends that the four factors enumerated in *Chambers* were simply indicia of trustworthiness of the statement and are not to be regarded as requirements for admissibility. The People argue that the presence of all four factors are [sic] conditions of admissibility.... The four factors which the court enumerated in *Chambers* ... are to be regarded simply as indicia of trustworthiness and not as requirements of admissibility. The question to be considered in judging the admissibility of a declaration of this character is whether the declaration was made under circumstances that provide "considerable assurance" of its reliability by objective indicia of trustworthiness.

Consistently with that analysis, *United States ex rel. Bracey v. Fairman*, 712 F.2d 315, 318 (7th Cir.1983) teaches the absence of an opportunity for cross-examination does not by itself permit exclusion of an inculpatory statement where other indicia of reliability exist:

> It is clear from *Wilkerson v. Turner*, [693 F.2d 121 (11th Cir.1982)] that absence of cross-examination does not necessarily establish unreliability. In that case the exculpatory statement was in an affidavit, but other indicia of reliability were deemed adequate. In *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), the exculpatory out of court statement was an oral confession by another to a witness, that it was he who had fired the fatal shot. The summary per curiam opinion locates reliability in corroborating evidence and in all the circumstances.

■ Williams first contends the trial court breached those principles by relying on Cuniff's unavailability for cross-examination as a reason to exclude the statement. But that does the trial judge an injustice, for he did not find Cuniff's unavailability the sole ground for excluding his statement. Instead the trial court pointed both to Cuniff's unavailability *and* to the absence of other indicia of reliability. If in fact Cuniff's statement lacked adequate corroborating circumstances, the trial court's identification of Cuniff's unavailability as an additional factor warranting exclusion was not erroneous.

Next Williams says the record does show enough corroboration to establish the reliability of Cuniff's admission. Williams points to five different circumstances for that purpose. This opinion will deal with each of them in turn.[5]

First Williams says the police knew about Cuniff's statement days before they arrested and charged Williams. But the fact the police were informed about Cuniff's statement in no way corroborates the statement's truth. That "fact" is wholly neutral as to the statement's reliability, so it does not help Williams at all.

Next Williams points out neither Cuniff nor the person to whom he admitted setting the fire knew Williams. That is said to prove Cuniff had no ulterior motive to shield Williams by making an incriminating statement. True enough, *Chambers* and its progeny say the fact a statement is against the speaker's interest is one factor to consider in determining its admissibility. But that is necessarily only the threshold inquiry (by definition the third party's statement must be self-incriminatory, else it would be nonprobative and hence automatically inadmissible). What the *Chambers* line of authority makes clear is that the need for independent corroboration is an *added* factor, not satisfied by the self-incriminatory nature of the statement. Thus Williams' argument simply misses the mark.

Williams also relies on the testimony by Hanover Park police officer Leo Siciliano ("Siciliano") that Cuniff's clothing smelled of a flammable substance the night of the

---

5. This kind of factual reexamination might also arguably be characterized as working at cross-purposes with *Sumner v. Mata*. But the line of demarcation (what is "fact"?) is not always bright, see the one-year-later decision in *Sum-* *ner*, 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam) ("the distinction between law and fact is not always easily drawn"), and discretion calls for a review of Williams' contentions on their merits.

fire (R. 1406). But Siciliano also said Cuniff always smelled of a flammable substance—glue (R. 1407-09)—the same odor "as often as I have had contact with Mr. Cuniff" (R. 1408). And Gustafson testified Cuniff had been snorting glue at the party (R. 1377-78). Moreover, tests of Cuniff's clothing showed no accelerant on his jacket or vest (R. 1514-16). In light of that evidence, the Illinois courts could reasonably have found that Siciliano's having said Cuniff smelled of a flammable substance provided no real corroboration of Cuniff's claimed statement.[6]

Only two facts relied on by Williams had any arguably corroborative tendency:

1. Mackowiak and Gustafson picked up Cuniff about one block from the apartment complex (R. 1343-44, 1379).

2. Cuniff called "fire" before Mackowiak and Gustafson saw it (R. 1344-45, 1380).

But once again, though differing views might arguably be held on the evidentiary force of those matters, no constitutional infirmity can be ascribed to the trial court's and Appellate Court's finding those two facts insufficiently corroborative to require admission of Cuniff's alleged statement.

In sum, Williams points to nothing clearly linking Cuniff to the crime. Although some facts do provide weak corroboration of Cuniff's purported statement, other evidence in the record undermines that corroboration. Even aside from his failure at the very threshold of this issue (discussed at the beginning of this section), Williams has

not come forward with enough "indicia of reliability" to require this Court to override the rulings of two levels of Illinois courts, thus forcing the admission into evidence of Cuniff's statement.

### Exclusion of Evidence of Tape Recording

Before trial Williams moved to bar the testimony of DeJonge and Saunders on the ground police officers had taped interviews with those witnesses but had not turned those tapes over to the defense during discovery. After a hearing, the trial court denied Williams' motion on the ground there was insufficient evidence to establish the police officers had in fact taped those interviews. Then the trial court granted the State's motion to bar any reference at trial to such tape recordings. Now Williams challenges that latter ruling.

Williams' theory at trial was that the State, in an attempt to bolster its weak and circumstantial case, coerced its witnesses to fabricate testimony adverse to Williams. Williams says evidence that the police had tape recorded its witnesses' statements but could not now produce those tape recordings would suggest the police officers had destroyed the tapes to conceal evidence of their coercive attempts during the interviews. Williams argues the trial court's exclusion of evidence relating to the tape recordings denied him the right to present his defense and thus denied him the right to a fair trial.

---

**6.** It is worth noting the truck in which Cuniff was a passenger went to the gas station only after Cuniff had been dropped off, so there was no evidence he had access to any accelerant (assuming the fire investigator's testimony an accelerant-set fire was accepted by the jury). In that same respect, though it is of course impossible to probe a jury's collective (and undisclosed) thought processes:

1. Williams, after his several statements of intention to start a fire and before he and his friends drove to the apartment building, stopped at a gas station where *he* got out of the car, pumped the gas and paid for it.

2. Williams had previously lived in the apartment building and could certainly have been presumed familiar with it.

3. Williams' statements about lighting a rag and throwing it into a box tracks perfectly with the fire investigator's finding, and the jury could rationally have found that fact would not have been known to anyone except the arsonist himself.

Given those facts, it was certainly within the jury's province to link them (again if it credited the investigator's testimony as to an accelerant) with an inference of Williams' access to an accelerant—either from the gas station (by the jury's not crediting his companions' testimony that they did not see him carrying anything) or perhaps in the building with which he was familiar. But speculation aside, the relevant factor here is the lack of *any* such evidentiary corroboration as to Cuniff.

**1456**

■ This Court is not a super-appellate state court. It does not sit to decide whether the trial court's ruling was correct or incorrect as a matter of the law of evidence. Instead this Court's role is to determine whether that ruling so prejudiced Williams as to deprive him of a fair trial in violation of the Fourteenth Amendment. It did not. Of course *every* adverse evidentiary ruling leaves a party with one less fact to put before (and argue to) the jury. But this record makes clear the challenged ruling did not impair Williams' presentation of his defense or his argument as to the weakness of the State's circumstantial evidence:

1. Williams' counsel freely questioned the State's witnesses about the police officers' attempts to coerce them into fabricating their testimony.

2. In fact both DeJonge and Mills testified the police threatened them with prosecution and long prison terms if they did not cooperate (R. 719–20, 795).

3. DeJonge testified the police tried to make him lie in two ways: to exaggerate the amount of time Williams spent inside the building and to testify falsely that Williams carried gasoline with him (R. 726, 728–29, 1104).

This was not a matter of excluding existing evidence, for the tapes existed no longer. Had this added fact gone to the jury they would have had to draw the further inference that the tapes' destruction was a coverup for coercion and not simply routine. And that hypothesis would at most have been cumulative on the coercion issue. Thus the excluded fact was not so crucial to Williams' defense that it would likely have affected the jury's verdict. Williams has not shown a due process violation here.

### Prosecutorial Misconduct

Next Williams contends prosecutorial misconduct during closing argument tainted his trial. *United States ex rel. Crist v. Lane,* 745 F.2d 476, 482 (7th Cir.1984) (citations omitted) states the standard governing that claim:

The heart of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial when viewed in its entirety, not the culpability of the prosecutor.... The appropriate inquiry, therefore, is not whether the prosecutor's conduct is conduct which "is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." ... The focus of federal due process review is to ensure that alleged improper prosecutorial argument does not warp the factfinding function of the jury by deflecting its attention away from consideration of the evidence presented at trial.... The essence of due process is fundamental fairness. The Constitution guarantees a fair trial, not a perfect one.... A trial is fundamentally fair if it results in a verdict reached through consideration of evidence properly admitted and which is untainted by improper influences. Thus, it is the totality of the effect of the alleged errors, not their mere presence or their number, which gives rise to, or defeats, a due process claim.

Here Williams identifies several instances of assertedly improper prosecutorial conduct to be tested by that standard.

### 1. Remarks About Cuniff

■ First Williams points out the prosecutor stated Cuniff did not take credit for setting the fire (R. 1684–85). Williams says any such statement improperly exploited the State's successful motion to exclude Cuniff's statements. Because the prosecutor knew Cuniff had made statements admitting responsibility for the fire, Williams urges his remarks deliberately conveyed false information to the jury.

This Court does not exercise a supervisory function over state prosecutors. However reprehensible their tactics may be, *Crist* frames the question in terms of the *effect* of those tactics. On that score the trial judge acted to correct any potential prejudice to Williams:

1. He immediately sustained objections to the remarks and stated: "Counsel, there's no evidence of that" (R. 1685).

2. Within a few minutes after that he instructed the jury in part (R. 1696)

Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded.

That same analysis applies to Williams' other Cuniff-related objections (Mem. 13) to the prosecutors' final arguments:

They further exploited their successful motion *in limine* by repeatedly ridiculing evidence of Cuniff's involvement as a "bootleg play" and as defense counsel's fraud and trickery to free defendant.

Again the prosecutors' arguments will never find their way into a text on model trial practice. But the trial court consistently curbed any verbal excesses on their part by sustaining objections and keeping matters within proper bounds.

No likelihood has been shown that the prosecutors' comments affected the result of the trial.[7] Williams has not demonstrated due process violations that so taint the jury's verdict as to render it constitutionally infirm.

### 2. *Remarks About Evidence Tampering*

█ As already mentioned, Williams' defense rested in part on his argument the police had tampered with evidence—an issue barred in limine by the prosecutors' motion. Williams Mem. 13 says "they exploited their successful motion" by ridiculing Williams' counsel's closing argument as a "wild goose chase" (R. 1673) and a "smoke screen" (R. 1688). Williams objects to those arguments as prejudicial.

In part those arguments deal with prosecutorial rhetoric corrected by the trial court's sustaining of objections. Nothing need be said in response, beyond this opinion's already-expressed rulings in the preceding section.

But Williams Mem. 15 makes plain his contention is principally a restatement of the already-dealt-with argument about the interview tapes: Lacking that evidence, the jury would be more easily persuaded by the prosecutors' argument that Williams' defense was simply a "smoke screen." Dressed in different garb, the assertion fares no better. Every unfavorable evidentiary ruling during a trial potentially affects the nature (and presumably the force) of the closing argument. Here the prosecutor's remarks simply highlighted a weakness in Williams' defense. In light of the other evidence of Williams' guilt, those remarks raised no due process concerns.

### *Illinois Appellate Court Ruling*

Williams Mem. 16–17 says the Illinois Appellate Court denied him due process by ignoring his double-jeopardy challenge to the natural life sentence imposed by the trial judge. As the next section shows, that challenge merits no more than token attention, and the Appellate Court cannot be faulted for giving Williams' arguments short shrift. But it *did* deal with them, and that negates any due process claim:

1. It considered and rejected Williams' contention he could not be convicted of multiple acts of murder arising out of a single act of arson (131 Ill.App.3d at 610–11, 86 Ill.Dec. at 712–13, 475 N.E.2d at 1091–92).

2. It addressed and rejected his argument that Illinois' mandatory life sentence provision did not apply to his case (131 Ill.App.3d at 611, 86 Ill.Dec. at 713, 475 N.E.2d at 1092).

### *Double Jeopardy*

█ Williams was convicted of one count of aggravated arson and three counts of felony murder. He was sentenced to a term of natural life imprisonment under

---

**7.** As the Appellate Court said in dealing with the same issue, 131 Ill.App.3d at 610, 86 Ill.Dec. at 712, 475 N.E.2d at 1091:

[W]e find that defendant was not substantially prejudiced by the allegedly improper statements by the prosecutors.

Ill.Rev.Stat. ch. 38, ¶ 1005–8–1 ("Section 1005–8–1"):

(a) A sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations.... (c) if the defendant has previously been convicted of murder under any state or federal law or is found guilty of murdering more than one victim, the ·court shall sentence the defendant to a term of natural life imprisonment....

Williams says the application of Section 1005–8–1 amounted to the imposition of consecutive sentences for multiple offenses arising out of a single course of conduct. According to Williams, the Illinois legislature did not intend Section 1005–8–1 to apply to such a situation. Hence Williams argues his sentence violates the double jeopardy prohibition of multiple punishments for the same offense under *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980).

Williams points to Ill.Rev.Stat. ch. 38, ¶ 1005–8–4 ("Section 1005–8–4"):

(a) .... The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court.

(b) The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record.

That enactment is said to create two implications:

1. Because Williams was convicted on three counts of murder, Williams says a life sentence imposed under Section 1005–8–1 amounts to "consecutive sentences for offenses which were committed as part of a single course of conduct." Section 1005–8–4 purportedly prohibits that result.

2. As Williams would have it, Section 1005–8–4 addresses situations in which multiple offenses arise from a single "course of conduct" but not from a single "act." That legislative omission, says Williams, indicates the Illinois legislature intended prior law governing that latter situation to remain unchanged. Williams relies on *People ex rel. Starks v. Frye*, 39 Ill.2d 119, 233 N.E.2d 413 (1968) to argue prior Illinois law absolutely prohibited the imposition of consecutive sentences for a single act.

Those arguments are fatally flawed in their major premise. Williams received a single life sentence under Section 1005–8–1 and not "consecutive sentences" under Section 1005–8–4. Section 1005–8–1's literal language clearly applied to Williams' convictions of multiple murders. Nor does. that language require any distinction between a "course of conduct" and a single act.

Both Section 1005–8–1 and Section 1005–8–4 are part of the Criminal Code, and conventional principles of statutory construction call for each to be given full effect. It would distort ordinary language to label Williams' one life sentence "consecutive" (consecutive to what?), and that skewed reading is the linchpin to any claimed inconsistency between the two sections. Once more Williams fails.

### Conclusion

There is no need for any evidentiary hearing, nor is there any genuine issue of material fact. Lane and Hartigan are entitled to a judgment as a matter of law. Williams' petition is dismissed on the merits.